**RECORD NO. 14-1027**

*In The*

# United States Court Of Appeals
### For The Fourth Circuit

**ANDREW KANE, Individually and as Personal Representative of the Estate of Andrew Dwayne Cornish,**

*Plaintiff - Appellee,*

v.

**BRIAN LEWIS; OFFICER JOHN LEWIS;
OFFICER JENSEN SHORTER; OFFICER LEAF A. LOWE;
KENNETH MALIK, Individually and in his Official Capacity as
Chief of Police for the Cambridge Police Dept.;
THE COMMISSIONERS OF CAMBRIDGE,
A Body Corporate and Politic,**

*Defendants - Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE**

_____

**BRIEF OF APPELLEE**

_____

**Terrell N. Roberts, III
ROBERTS & WOOD
6801 Kenilworth Avenue
Suite 202
Riverdale, MD  20737
(301) 699-0764**

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 141027      Caption: Andrew Kane, et al v. Brian Lewis, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Andrew Kane, Individually and as Personal Representative of the Estate of Andrew Dwayne Cornish
(name of party/amicus)

_____

who is _____Appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                              ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                         ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: 2/7/2014

Counsel for: Appellees _____

## CERTIFICATE OF SERVICE
***************************

I certify that on _Feb. 7, 2014_ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Daniel Karp, Esq.
120 E. Baltimore Street
Suite 1850
Baltimore, Maryland 21202

_____          Feb. 7, 2014
(signature)                      (date)

- 2 -

**TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Failure to Knock and Announce and The Deadly
Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Additional Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.    THE DISTRICT COURT DID NOT ERR IN DENYING THE
OFFICERS' MOTION TO ALTER OR AMEND JUDGMENT.
REGARDLESS OF THE JURY'S VERDICT ON THE
EXCESSIVE FORCE CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.    The District Court Did Not Err In Denying The Officers
Motion To Alter Or Amend The Judgment. Regardless
of the Jury's Verdict On The Excessive Force Claim,
The Jury Had Considerable Evidence Upon Which To
Base Its Verdict That The Officers Violated Cornish's
Constitutional Rights By Failing Properly To Knock and
Announce And To Find That The Violation Was A
Proximate Cause Of Cornish's Death. . . . . . . . . . . . . . . . . . 27

C.    The Cases Relied Upon By The Officers Are Inapposite. . . . 39

II.    THE DISTRICT COURT DID NOT ERR WHEN IT DENIED
THE OFFICERS'S MOTION TO ALTER OR AMEND THE
JUDGMENT ON THE BASIS OF THE QUALIFIED
IMMUNITY DEFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.    Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.    The Officers Cannot Make A Qualified Immunity
Defense On The Basis Of A Particular Set Of Facts
Because They Failed To Request Specific Factual
Findings Which Would Identify The Particular Conduct
Which They Contend They Did Not Know Was
Unlawful. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

C.    Viewing The Evidence In Kane's Favor, The Jury
Decided That The Officers Failed To Knock And
Announce Before Entering Cornish's Apartment. This
Was A Violation Of Clearly Established Law And Ends
The Issue.  If One Also Considers That The Officers
Failed Properly To Knock And Announce By Not
Waiting A Sufficient Amount of Time Before Entering
The Apartment, This, Too, Was A Violation Of Clearly
Established Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

III.   THE COURT'S INSTRUCTIONS ON KNOCK AND
ANNOUNCE WERE LEGALLY CORRECT . . . . . . . . . . . . . . . . . 51

A.    Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

IV.    THERE IS NO IMMUNITY FOR A MARYLAND
CONSTITUTIONAL VIOLATION. . . . . . . . . . . . . . . . . . . . . . . . 57

A.    Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

-ii-

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Creighton*,
   483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Ashton v. Brown*,
   339 Md. 70 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Bank of Montreal v. Signet Bank*,
   193 F.3d 818 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 42, 57

*Bodine v. Warwick*,
   72 F.3d 393 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Clea v. City of Baltimore*,
   312 Md. 662 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*College Loan Corp. v. SLM Corp.*,
   396 F.3d 588 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Crawford-El v. Britton*,
   523 U.S. 574 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Crinkley v. Holiday Inns, Inc.*,
   844 F.2d 156 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 46

*DiPino v. Davis*,
   354 Md. 18 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*EEOC v. Lockheed Martin Corp. v. Aero & Naval Sys.*,
   116 F.3d 110 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Estate of Sowards v. City of Trenton*,
    125 Fed. Appx. 31 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Gomez v. Toledo*,
    446 U.S. 635 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Gould v. Davis*,
    165 F.3d 265 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36, 46, 47

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Hofherr v. Dart Indus., Inc.*,
    853 F.2d 259 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Hope v. Pelzer*,
    536 U.S. 730, 122 S. Ct 2508 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Hudson v. Michigan*,
    547 U. S. 586 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*James v. Chavez*,
    511 Fed. Appx. 742 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*McDonald v. United States*,
    335 U.S. 451 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Mensh v. Dyer*,
    956 F.2d 36 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Miller v. United States*,
    357 U.S. 301(1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Monell v. Department of Social Services*,
    436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Monroe v. Pape*,
   365 U.S. 167 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Myrick v. Prime Ins. Synd., Inc.*,
   395 F.3d 485(4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Noel v. Artson*,
   641 F.3d 580 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pac. Ins.Co. v. Am. Nat'l Ins. Co.*,
   148 F.3d 396 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Pinder v. Johnson*,
   54 F.3d 1169 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Richardson v. McGriff*,
   361 Md. 437 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Sales v. Grant*,
   224 F.3d 293 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Simons v. Montgomery County Police Officers*,
   762 F.2d 30 (4th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Suarez Corp. Industries v. McGraw*,
   125 F.3d 222 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Teague v. Bakker*,
   35 F.3d 978 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Banks*,
   540 U.S. 31 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48, 49, 50

*United States v. Bragg*,
   138 F.3d 1194 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-54

*United States v. Crawford*,
  657 F.2d 1041 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Drummond*,
  98 F. Supp. 2d 44 (D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Lewis*,
  53 F.3d 29 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Lipford*,
  203 F.3d 259 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*United States v. Ward*,
  171 F.3d 199 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*United States v. Young*,
  609 F.3d 348 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*Widgeon v. Eastern Shore Hosp. Center*,
  300 Md. 520 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Willingham v. Crooke*,
  412 F.3d 553 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## **<u>Statutes</u>**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 33

Maryland Code, Courts Art., 5-507(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**Constitutional Provisions**

Md. Code Ann., Decl. of Rts. art. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

U.S. Const. amend IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 36, 39, 58

**Rules**

Fed. R. Civ. P. 7(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fed. R. Civ. P. 7(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. Civ. P. 49(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

Fed. R. Civ. P. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 57

Fed. R. Civ. P. 50(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fed. R. Civ. P. 50(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fed. R. Civ. P. 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Fed. R. Civ. P. 59(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Federal Rules of Civil Procedure 59, Advisory Committee Notes
(1996 Amendments) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

**Other Authority**

RESTATEMENT (SECOND) OF TORTS § 442b (1965) . . . . . . . . . . . . . . . . . . 38

## STATEMENT OF THE CASE

On May 5, 2005, at 4:30 a.m., four members of the City of Cambridge, Maryland's police department entered the upstairs apartment of Andrew Cornish ("Cornish") to execute a search warrant that authorized a search for drugs. JA. 473. Without first knocking and announcing before entering the apartment, the officers knocked down Cornish's apartment door with a sledgehammer. JA 288, 458, 477. An officer, Brian Lewis, shot and killed Cornish within a few feet of his front door. JA 861. A lawsuit was filed and a jury heard all the evidence. The jury verdict was that the officers violated the Fourth Amendment's knock-and-announce requirement and it awarded damages to the victim's father, Andrew Kane ("Kane"). JA 1091.

### Procedural History

On May 5, 2008, Kane filed a six count complaint against Officers Brian Lewis, Leaf Lowe, Jensen Shorter, and Sgt. John Lewis (hereafter referred to as "the Officers") and Chief of Police Kenneth Malik and the City of Cambridge, Maryland. Under 42 U.S.C. § 1983, Kane alleged that Brian Lewis was liable for violations of the Fourth Amendment by using excessive force and by executing a search warrant in an unlawful manner, i.e., failing to knock and announce the Officers' presence and purpose before entering Cornish's apartment. The

-1-

complaint also alleged similar claims under the Maryland Constitution.  Six counts

were made:

| Count 1 | 42 U.S.C. § 1983 | Wrongful Death: Unreasonable search and seizure by use of excessive force and  unlawful execution of a search warrant without knocking and announcing. |
| Count 2 | 42 U.S.C. § 1983 | Survival Action: same claims as made under Count 1. |
| Count 3 | Md. Const. Claim | Wrongful Death damages for Md. Constitutional violations, i.e., use of excessive force and unlawful execution of a search warrant by failing to knock and announce. |
| Count 4 | Md. Const. Claim | Survival Action: unreasonable search and seizure and use of excessive force in violation of Md. Constitution. |
| Count 5 | 42 U.S.C. § 1983 | *Monell* claim against the City of Cambridge |
| Count 6 | 42 U.S.C. § 1983 | Claim against Chief of Police Kenneth Malik, failure to supervise, train and discipline. |

On March 26, 2010, the district court granted the officers' motion for

summary judgment in part and denied it in part.  JA 49.  It held that Brian Lewis

had qualified immunity with respect to the claim of excessive force.  JA 47.

However, the court held that there was a genuine issue of material fact in dispute as to whether the Officers knocked and announced their presence and purpose before entering Cornish's apartment.  JA 44-45.

On May 5, 2010, the Officers filed a motion *in limine* to limit the damages which Kane could recover on the knock and announce claim.  On July 9, 2010, the court ruled on the motion.  The court held that the evidence supported a claim for either nominal damages or compensatory damages for any emotional distress suffered by Cornish from "the period beginning when the police burst into the apartment and ending when Cornish either realized that the invaders were the police or when he was shot and killed."  JA 53.  The court, however, ruled that the same evidence did not allow a recovery of compensatory damages on Kane's wrongful death claim because "Mr. Cornish must have known that the men in the apartment were police officers but advanced on them nonetheless, and that no reasonable jury could conclude otherwise."  JA 79.

On April 4, 2011, Kane dismissed the survival claims (Counts 2 and 4) with prejudice and dismissed the *Monell* claim (Count 5) and the claim against Chief Malek (Count 6) without prejudice.  He then noted an appeal.  The Officers cross-appealed the lower court's denial of summary judgment on their defense of qualified immunity on the knock and announce claim.

-3-

Ultimately the Court dismissed both appeals for lack of jurisdiction.  JA 74. It held that the judgment appealed from was not a "final judgment," because it was still possible for Kane to recover nominal damages on his knock and announce claim.  As to the Officers' cross appeal, the Court held that it had no jurisdiction to review the district court's determination that a genuine issue of material fact existed, namely, whether the Officers knocked and announced before they entered the apartment.  JA 76-77.

On remand, the district court judge, the Honorable Benson Everett Legg, probed for ways to try the case, including asking Kane to consider abandoning the knock and announce claim – a choice which Kane rejected.  JA 81-83.  Judge Legg decided to proceed to a jury trial on the issue whether "a knock and announce violation occurred."  JA 83.  Subsequently, on December 7, 2012, the case was reassigned to the Honorable J. Frederick Motz. JA 15.  In a letter order dated February 22, 2013, Judge Motz determined that unless he changed some of Judge Legg's rulings, "the case will proceed to trial solely on the nominal damages claim as to whether the police officers improperly entered the premises where Andrew Cornish was shot and killed."  JA 84.  Judge Motz decided to rescind Judge Legg's prior rulings as to the excessive force claim and the question

whether the plaintiff can recover damages on the wrongful death claim and determined that the jury should consider those issues. JA 84.

Trial of the case began on October 7, 2013. On October 10, 2013, the jury returned its verdict. JA 1092-93. Although the jury decided in favor of Brian Lewis on the claim of excessive force, it determined that the Officers violated Cornish's constitutional rights by failing properly to knock and announce before entering Cornish's apartment, and it awarded Kane $250,000 in compensatory damages on his wrongful death claims against the Officers and the City of Cambridge. JA 1091.

The court entered judgment on the verdict on October 15, 2013. The Officers and the City of Cambridge moved to alter or amend the judgment on grounds which will be mentioned in the argument to follow. The Court denied the motion except in so far as it reduced the judgment against the City of Cambridge to $200,000. JA 1111.

### Statement of Facts

Cornish was 31 years of age at the time of his death. JA 244. He lived with his uncle, Brad Cornish, age 49. JA 478. They lived in the upstairs portion of a two story wood frame house located at 408 High Street, Cambridge, Maryland. JA 478. The house was built 60-70 years ago and they had lived in it for the past

fifteen years.  JA 668.  Andrew and Brad did not own the property but rented the upstairs part of the house.  JA 666.

Karen Camper rented the downstairs of the house.  JA 448, 666.  She lived in the house since 1992.  JA 448, 461.  She resided with her boyfriend, Nathan Latting, who lived in the house for 2-3 years before the event at issue.  JA 284-285, 449.

Officer Lowe's application for the search warrant of Cornish's apartment stated that "beginning March 28, 2005, your Affiant was contacted by a concerned citizen who advised your Affiant that there was CDS activity from the residence of 408 High St. Apartment (b)."  JA 240.  Lowe acknowledged that he did not speak with the citizen, but that his supervisor did so. JA 575.  Asked what the "CDS activity" was exactly, Lowe stated: "A lot of comings and goings from the residence itself."  JA 820.  He testified that he frankly didn't know whether the citizen reported that drugs were being sold out of the house or in particular out of Cornish's apartment.  JA 575-576, 848.  He could not recall if he ever asked.  JA 848.  Lowe's supervisor simply told him that he received a complaint of "drug activity" from the residence and that he wanted Lowe to start an investigation.  JA 820.

Lowe limited his investigation to pulling trash left in trash cans in front of 408 High Street and analyzing the contents. JA 240-41. He and Brian Lewis searched the contents of the trash cans on April 5, 2005 and April 19, 2005. JA 240-41. According to the warrant application, on April 5th, the officers recovered from trash cans attributable to the upstairs apartment "numerous partly smoked cigars" and "green leafy vegetable matter," which was screened as suspected marijuana. JA 240 On April 19th, they recovered "a green leafy substance, which was screened as marijuana. JA 241. According to the evidence, Lowe and Brian Lewis obtained the same kind of evidence from the trash cans attributed to Camper's apartment. But on each trash pull, the amount of suspected marijuana was unspecified. JA 240-241. Brian Lewis testified that they found no more than "trace amounts" of suspected marijuana. JA 579.

On the basis of such evidence, on April 25, 2014, Lowe got search warrants issued for both Cornish and Camper's apartment. The warrants commanded to "search forthwith." JA 237. But Lowe waited until May 6, 2005 to execute the warrants. This was 17-days after the last trash pull.

The Officers did not defend on the grounds that an unannounced entry to Cornish's apartment was necessary to avoid potential resistance or violence if the Officers knocked and announced. They were concerned about possible resistance

-7-

by Latting, but they had no such concern about either Brad or Andrew Cornish.

JA 659, 822. Sgt. John Lewis testified: "We anticipated no problems whatever out

of the upstairs apartment." JA 559-660. Lowe flatly conceded a lack of exigent

circumstances for a no-knock entry of Cornishs' apartment. JA 537. He testified

that he knew Andrew and Brad Cornish and that from time to time while on bike

patrol he stopped on their porch on a hot day and drank a Pepsi with them. JA

536-537. Lowe also testified that in May 2004, he executed a search warrant at

Cornish's apartment in error because it was intended for Latting's apartment. JA

260, 541. Cornish was not home at the time. JA 541. Lowe searched Cornish's

room – a fact which he originally denied at his deposition a few years earlier . JA

541, 544. Lowe stated that he and Sgt. Mark Lewis knocked on Andrew Cornish's

door later to inform him that he was not going to be charged with possessing

marijuana found in his apartment in the search. JA 540. Lowe said that Cornish

opened the door and that he was "very cooperative." JA 541.

Notwithstanding, Lowe and the other Officers wanted to execute the search

warrants for both apartments with "the element of surprise." JA 534, 596, 636.

Lowe decided to execute the warrants at night because he expected the residents to

be asleep. JA 535. He wanted to conduct a "dynamic entry," meaning to enter the

apartments quickly with an overwhelming show of force. JA 536.

-8-

Lowe admitted that in his deposition he was asked why he didn't execute the warrant for Cornish's apartment at a different time, and that he said then: "I can't answer that." JA 850.

Keeping with the element of surprise, Lowe intended for his officers to make a stealthy entry through the exterior common door of the house. JA 545, 824. That door is a wooden door with a large, see-through glass insert. JA 296, 668. Lowe thought there was a chance that door might be unlocked. JA 546. According to the evidence, it was typically left unlocked. The landlord, Jeffrey Dayton, regularly came to the property and collected the rent. He testified that he always found the outside front door to the house to be unlocked, and he recalled never using a key to open the outside door. JA 667. Nathan Latting testified that the outer door was kept unlocked because nobody had a key. JA 293. Brad Cornish testified that even if the outside door was locked, one could force it open with little difficulty, given its poor condition. JA 487. The door itself was not sturdy or in good condition, and the door striker was old and showed evidence of either damage or just being worn. JA 487, 673. A photograph of the door was in evidence. JA 255.

Once a "stealthy" entry was made, the plan called for five officers to approach Camper's apartment and four officers led by Sgt. John Lewis to

approach Cornish's apartment. JA 659, 848. The order of the day was that each

team of officers would simultaneously knock and announce on the inner door to

each apartment. JA 545, 547, 794, 810, 824.

After one enters the outer door to the house, there is an entryway five feet

wide and eight feet deep. JA 668. To the left is the entrance to Camper's

downstairs apartment and straight ahead are the stairs to Cornish's upstairs

apartment. JA 668.

Brad Cornish, age 49, testified that he saw Andrew Cornish at midnight of

the night Andrew was shot. At that time Andrew was awake and they shared a

Pepsi together and conversed. JA 480. Andrew was dressed only in his boxer

shorts. Brad left the house about 2:30 a.m. Before he left, Andrew went to his

room, the master bedroom. JA 480. The door to Andrew's room was open when

Brad left the house. JA 483. Brad testified that the door to the room was old and

ill-fitting: it had to be lifted up in order to open or close it. JA 483-484.

### The Failure to Knock and Announce and The Deadly Consequences

The Officers testified that they did not make a stealthy entry at the exterior

common door because it was locked. JA 825. They testified that after finding the

door to be locked they were forced to knock and announce at that door and after

receiving no response they breached the door by striking it with a 25 lb. solid metal ram. JA 547. Their version was that they began continuously yelling "Cambridge Police Search warrant." They then went to each apartment door and knocked and announced once again and breached those doors when they got no response. JA 550, 552. They testified that the knocking and announcing at each door was not simultaneous due to the fact that they had to knock and announce at the exterior common door outside. JA 818. Kane presented evidence to dispute the Officers' version.

Karen Camper is employed as a bus driver. JA 476. She testified that the evening before the raid she came home around 11:30 p.m. and went to bed within an hour of coming home. JA 449, 462. She described herself as a light sleeper. JA 452. At about 4:30 a.m., she became aware that Latting had got out of bed. JA 451. A few seconds later, she heard a "boom" followed by commands "Get down!" JA 451. Camper testified that the "boom" came from the front door to her apartment. JA 452-453.

The "boom" was the first noise that Camper heard. Before the "boom," she did not hear any other noises. JA 452-453. Her bedroom windows are on the side of the house, JA 211 & 450. From experience, she can hear voices at the front of the house if they are louder than a whisper. JA 463. And she can certainly tell if

-11-

people are out there, even if she can't hear every word.  JA 463.  Camper testified that if the police had yelled, "police, search warrant," and  banged on the common exterior door, she would have heard it.  JA 459, 464.  She definitely would have heard a ram striking and "busting" open the front door if that had occurred.  JA 453, 464.

Camper testified that her hearing is "good."  JA 458.  She said that she is very familiar with the sounds in the house, given the length of time that she has lived in the house.  JA 463.  She also said that the walls in the house are "thin," which improved her ability to hear noises in the house.  JA 459.

Camper testified that if the police had announced themselves at Cornish's apartment door before she heard the "boom," she would have heard it.  JA 458, 477.

After being taken into custody, Camper was escorted to the living room where she sat on a couch next to the front door.  An officer came down and told another officer that there had been a shooting.  JA 455-456.  She heard a police officer who was upset outside her front door say, "I thought he had a gun."  JA 456.

Nathan Latting, age 44, testified that he got out of bed to go to the bathroom when he heard a "boom" at the front door of the apartment.  JA 284, 286.  When

he heard the boom, he was 10-15 ft. from the front door. JA 287. He testified that he did not hear a knock or announcement or any voices before he heard the boom. JA 287, 289. He also did not hear any noises coming from Cornish's upstairs apartment before he heard the "boom." JA 288. The front door to Camper's apartment was "a real thin cheap door," and he could easily hear anything in the hallway. JA 288-289.

Both Camper and Latting were interviewed by the Maryland State Police detectives on the morning of the shooting, May 6th. JA 439. The Officers, on the other hand, did not give statements to the Maryland State Police until May 13th. JA 628. They all had the benefit of having the same lawyer who prepared them for their interviews. JA 628. Prior to their interviews, the Officers had a joint session with a psychologist in which they discussed the facts of the event. JA 628.

There was a complete absence of repairable damage to the outside door to the apartment building despite the fact that the Officers testified that they used a 25 lb. solid metal battering ram to make a "good hard strike" on the outer door. JA 547. Nor was the glass insert in the door broken. JA 547. Jeffrey Dayton, the landlord, testified that he did not see any visible damage to the outer door. JA 668-669. By contrast, he had to repair or replace Camper and Cornish's apartment doors due to extensive damage to both. JA 669.

-13-

Officer Shorter testified that as he came up the stairs to Cornish's apartment he intended to make a "quick entry" because they had lost the "element of surprise" earlier.  JA 636.  Sgt. John Lewis testified that Officer Shorter knocked three times twice followed each time by an announcement and then paused a second to three seconds before breaching Cornish's door.  JA 657.  Brian Lewis also testified that they paused after the last set of knocks for only one to three seconds before breaking Cornish's door.  JA 598.  Lowe testified that the pause before striking the door was one to two seconds.  JA 553.  In Sgt. Lewis' view, one to three seconds was more than enough time for a subject to get to the door. JA 657.  Asked if a person should be given enough time to pull on clothes, Sgt. Lewis testified that it was "up to each individual person.  I've had them come to the door naked."  JA 657.

Lowe had been in Cornish's apartment on a prior occasion and he was familiar with the layout of the apartment, including the location of bedrooms, kitchen and bathroom.  JA 537.  He briefed the other officers on the layout as well. JA 537.  While standing outside Cornish's apartment door, the Officers did not hear any foot steps going to the kitchen or bathroom where drugs could have been washed down the sink or flushed down the toilet.  JA 556.  Brian Lewis testified

that he did not hear footsteps or movement in the apartment.  JA 599.  He said that he is listening for "anything" and he heard "nothing."  JA 599.

Officer Shorter and Brian Lewis' version was that they penetrated into the living room and went to Cornish's bedroom door.  Wearing black sole boots, Shorter said that he kicked the door (against its hinges) in a fruitless effort to open it.  JA 642-643.  Brad Cornish testified that there were no marks on the door from boot strikes.  JA 791.  While standing in the arc of the doorway, Shorter was about to reach for the door handle when the door flew open and knocked him hard and to the right, and nearly down to the floor.  JA 646.  Shorter said that he lost sight of Brian Lewis, but saw Cornish charging across the living room swinging a knife like a machete.  JA 646, 648.

Within a few hours of the event, a Maryland State Police evidence technician and a homicide detective took photographs of the interior of the house. JA 403. Photographs of the area where Shorter said that he was knocked back and almost down show an area cluttered with objects; foremost among them were a bicycle and stereo speaker, both of which were standing upright and undisturbed. JA 205-206.  Asked if he could explain why he did not hit and knock over these objects, Shorter said: "No explanation at all."  JA 648.

-15-

Shorter, who weighed 215 lbs, was the "point man," who is the person trained to handle any threat that developed. JA 589. He was wearing a helmet, goggles, a heavy-duty ballistic vest, heavy boots, and he had a high-intensity light on his gun. JA 638, 640.

Shorter testified that as Cornish charged toward the kitchen, he swung the knife like a "machete." JA 899. Then he switched and said that Cornish held the knife like a dagger, with the blade coming out of the bottom of the hand. JA 899. Brian Lewis also testified that Cornish swung the knife like a "machete," but that he held it like a dagger, with the blade coming out of the bottom of the hand. JA 616, 865. Brian Lewis said that he saw a knife, but he could not say whether it was in a sheath. JA 866. He acknowledged that the threat level "would have been a little different" if he knew the knife was in a sheath. JA 868.

Brian Lewis testified that he backed all the way into the kitchen before he fired his gun. JA 620. He was a skilled marksman. JA 622. When he fired his gun at Cornish, he said that he aimed for "center mass." JA 622. He said that Cornish looked right at him, coming full-tilt. JA 623, 624. He denied that Cornish was starting to go down before he shot him. JA 623. He fired two shots in quick succession. JA 861. When he fired the gun, Cornish was standing

-16-

straight up and had the knife in his right hand at ear level. JA 860. Cornish was in the same position when he fired the second shot. JA 862.

The Maryland Medical Examiner's Office conducted an autopsy on the body of Andrew Cornish. JA 244. The autopsy noted that the body weighed 189 lbs and was 5'7" in length. JA 245. Two gunshot wounds were recorded. There was a gunshot entrance wound to the right side of the forehead. JA 245. The wound path was from front to back and "slightly downward." JA 246. This wound produced significant brain hemorrhage and fractures of the base of the skull and frontal and parietal bones. JA 246. The next gunshot wound entered the left cheek. JA 246. The wound path was from front to back, slightly left to right, and downward. JA 246. A photograph shows the downward angle. JA 235.) The bullet injured the jawbone and muscles of the neck and back. Toxicology studies of the blood were negative for alcohol and studies of the urine were negative for drugs. Appx. JA 250-251.

Dr. John Adams, a physician and board certified anatomical pathologist, examined photographs of the crime scene and autopsy, read the autopsy report, and examined the sheathed knife. Dr. Adams opined that the gun shot to the left cheek was the first shot. JA 683. He based his opinion on the pattern of blood spillage on the floor. JA 692. There is a blood pattern on the floor suggesting that

blood fell from Cornish's left cheek wound as he fell to the floor. JA 692. Dr.

Adams also noted a few round spots of blood on the floor, indicative of drops of

blood from Cornish's left cheek falling directly vertically. JA 692. These suggest

at the time little or no forward movement by Cornish. Dr. Adams testified Cornish

could have remained erect for a brief while after the shot. JA 696.

According to Dr. Adams, due to the downward trajectory of the first shot,

Cornish either had his chin down or ducked before he was shot. JA 702, 714.

Dr. Adams opined that the second shot was to the forehead and caused

Cornish to fall over. JA 713. He could not conclude one way or the other whether

Cornish was holding a sheathed knife in his right hand at the time of the first shot,

but he could firmly say that Cornish did not have the sheathed knife in his right

hand when the bullet struck the forehead. JA 697. The bullet to the right forehead

caused a "blowback" of brain tissue and blood from the hole in the skull. JA 698.

Dr. Adams pointed to evidence of blowback on the right forearm and hand can be

seen on police photographs at the scene. JA 200. He concluded that Cornish's

right hand was raised in front of the face within 10 inches of the entrance wound

to the head when that injury occurred. JA 705. If Cornish held the knife in his

right hand when the bullet struck him in the forehead, Dr. Adams stated that he

would expect to find the pattern of blowback splatter on the knife and sheath,

-18-

regardless of how Cornish held the knife.  JA 689, 697-698.  Dr. Adams inspected the knife and sheath and he did not see any evidence of blowback blood splatter. JA 690.

Dr. Adams noted that there was no blood spillage in the living room. JA 715.  Dr. Adams testified: "I'm assuming that he was shot at the threshold and this is the first drainage. If he were shot back in the living room, you would see some pattern [of blood] back there."  JA 715.

Dean Allen Evans is a pastor of United Missionary Baptist Church in Cambridge, Maryland. JA 717. He received his education at Duke University and North Carolina College of Theology.  JA 718.  He has been a pastor for 42 years. JA 717.  He knew Andrew Kane as one of the deacons in the church.  JA 717. Dean Evans testified that in his observation Kane grieved over his son, and he provided Kane with pastoral counseling and guidance to deal with his grief.  JA 718-719.

Kane testified that he lived with his son for 15 years, during his son's youth. JA 273.  Kane taught his son carpentry and work skills.  JA 724.  After his son reached adulthood, he and  his son worked together on occasion; they also enjoyed fishing and eating out together.  JA 724.

-19-

Kane testified that he grieved over his son's death, "mostly all the time." JA 725. He said: "I just think about it so much, I even want to leave this world myself." JA 725.

### Additional Procedural History

The Officers moved for judgment at the conclusion of Kane's case. Counsel for the Officers argued:

> But if the Court were to accept, and I think this is sort of a two-part argument, my argument that the use of force fails as a matter of law, then I would say that the second, one consequence of that is not only a judgment for Brian Lewis on that topic, but that the plaintiff's damages would be limited on the knock and announce issues to nominal damages.

JA 742. Referring to the preceding history of the case, Counsel stated, JA 742-743:

> It was the subject of a motion in limine on the issue of causation. The basic defense point was that if the shooting was reasonable, lawful, justified, then it was reasonable, lawful, justified regardless of whether there was a violation of knock and announce or not. The shooting is either good or it isn't. And if the shooting is good, then the only damages which could flow in these circumstances from a violation of knock and announce is nominal damage.

At the conclusion of all the evidence, counsel for the Officers moved again for judgment. The district court judge allowed counsel to adopt the grounds set forth earlier in moving for judgment at the close of the plaintiff's case.

-20-

The jury returned its verdict on October 10, 2013. According to the verdict sheet, the jury did not find by a preponderance of the evidence that "Officer Brian Lewis violated Andrew Cornish's federal constitutional rights by using unnecessary and excessive force in shooting him?" JA 1091. However, the jury did find "that the individual defendants violated Andrew Cornish's federal constitutional rights by failing properly to knock and announce before entering the apartment." JA 1091. The jury also found that the Officers violated the Maryland Constitution by failing properly to knock and announce before entering the apartment. JA 1093. The jury also declined to award nominal damages, but it awarded Kane $250,000 in compensatory damages on his wrongful death claims. JA 1093.

The Officers filed a motion to alter or amend judgment, citing Rules 50 and 59 as legal authority for the motion. The grounds for the motion were: 1) that a verdict in Officer Brian Lewis' favor on the excessive force issue limited Kane to nominal damages on the knock and announce violation; 2) that the court erred in instructing the jury on the knock and announcement requirement; 3) that the Officers were entitled to qualified immunity; and 4) that Maryland statutory immunity insulated the Officers from liability on the state law claim and capped the judgment on that claim at $200,000.

-21-

The district court denied the motion to alter or amend in part and granted it in part. JA 1111. It held that the jury's verdict on the excessive force claim did not warrant a judgment in the Officers' favor on the knock and announce claim. The court reasoned that on the basis of the available evidence the jury could have found that even if Lewis had acted appropriately when he shot Cornish, "the defendants created an unreasonable risk of harm by their violation of the knock and announce rule." JA 1110. It denied that the evidence established as a matter of law that Cornish's conduct was a superseding cause of his own death. JA 1108. If the jury concluded that Cornish was carrying a knife when he was shot, the court concluded that it was not unreasonable for him to do so because there was evidence that the Officers failed to knock and announce and alert Cornish to their presence and purpose. JA 1110-1111.

The district court also denied the Officers qualified immunity, holding that the law with respect to the duty to knock and announce was well established and that the officers were charged with knowing it in the circumstances of the case. JA 1108. It also held that the Officers did not have immunity under Maryland law. JA 1109, n. 2. Finally, it held that the amount of the verdict was within the province of the jury and that there was no reason for the court to disturb it. JA 1110.

-22-

The court granted the motion in so far as it reduced the judgment against the City of Cambridge on the state law claim to $200,000. JA 1110.

## SUMMARY OF ARGUMENT

The District Court did not err in denying the Officers' motion to alter or amend the judgment, regardless of the jury's verdict on the excessive force issue. The jury had considerable evidence to reach a verdict that the Officers violated Cornish's constitutional rights by not knocking and announcing before breaking doors to his apartment and that such conduct was a proximate cause of Cornish's death. Two witnesses in the downstairs unit, and who were in a position to know, testified that they did not hear the Officers knock and announce at any door, and the jury could clearly infer from their testimony that the Officers did not knock at Cornish's apartment door. Moreover, the jury had ample evidence upon which to reject the Officers' version how the entire event happened, including their contention that Cornish advanced upon them fully aware of who they were. The jury had sufficient evidence to conclude that Cornish's death was a foreseeable consequence of the Officers's violation of Cornish's constitutional rights by failing to knock and announce as required by law and that his own conduct was not a superseding cause of his death. Thus, the district court properly denied the

Officers' post trial motion to alter the judgment to reduce the award to nominal damages.

The district court properly denied the Officers' motion to alter the judgment on the basis of the qualified immunity defense. The Officers failed to squarely present the defense and preserve the issue for appellate review. They did not request specific factual questions to be submitted to the jury to show what specific conduct the jury found occurred. Thus, there is no support in the record for the Officers' contention that the law was not clearly established with regard to the amount of time that police officers must wait before forcibly entering a dwelling. Alternatively, the law was clearly established at the time that, absent exigency, the police must knock and receive an actual refusal or wait out the time necessary to infer one. The jury had sufficient evidence that the amount of time the Officers claimed that they waited after knocking and announcing was entirely too short to give Cornish adequate time to respond to the door.

The district court correctly instructed the jury that the duty to knock and announce commenced at Cornish's apartment door. The court properly rejected the Officers' instruction that allowed the jury to conclude that knocking and announcing at the outside door to the building alone was sufficient to comply with the knock and announce requirement. The logic of the knock-and-announce rule

-24-

applies to an individual dwelling to be searched, not to the outside door of a

building which may have two or more dwellings.  There was no requirement to

knock and announce at the outer door since the evidence showed that the parties

did not have an expectation of privacy in the vestibule or entrance way behind the

outer door.

The district court properly denied the Officers' claim that statutory

immunity protected from them from suit for a Maryland Constitutional violation.

## ARGUMENT

### I.    THE DISTRICT COURT DID NOT ERR IN DENYING THE OFFICERS' MOTION TO ALTER OR AMEND JUDGMENT, REGARDLESS OF THE JURY'S VERDICT ON THE EXCESSIVE FORCE CLAIM.

#### A.    Standard of Review

The Officers' Statement of Issues framed the first issue as follows:

[W]hether the district court erred by refusing to limit Andrew Kane's
wrongful death recovery to nominal damages based upon the lack of
legal causation between the Officers' failure "properly to knock and
announce" and Officer Lewis' justified shooting of Andrew Cornish
in self-defense; and whether Andrew Cornish's actions were the
superseding legal cause of his own death?

Officers' Brief, p. 1.  This statement does not precisely identify the specific ruling

or decision which is being appealed.  It refers to the district court's "refus[al] to

limit Andrew Kane's wrongful death recovery to nominal damages," but the ruling

is not more clearly described.  An argument heading in the Officers' brief, p. 33, states:

> BASED UPON THE JURY'S VERDICT IN FAVOR OF BRIAN
> LEWIS ON THE USE OF FORCE CLAIM, ANY FAILURE ON
> THE OFFICERS' PART PROPERLY TO KNOCK AND
> ANNOUNCE THEIR PRESENCE WAS NOT THE LEGAL CAUSE
> OF ANDREW CORNISH'S DEATH.

Under this heading, the Officers argue that "[t]he district court erred in refusing Appellants' request to *remit* the verdict to nominal damages."  Brief, p. 42.  (*Emphasis added.*)  At another point in the argument, the Officers assert that they "respectfully seek a ruling from this Court that Andrew Kane's non-economic damages award *should have been limited to or reduced* to nominal damages only."  Brief, p. 43.  (*Emphasis added.*)

Based upon the foregoing, Kane shall consider the Officers' appeal to be an appeal of the district court's decision denying their motion to alter or amend the judgment.  Kane does so on the basis of the fact that it is the only motion which the Officers filed after verdict and which  sought to limit Kane's recovery on his wrongful death claims to nominal damages.

The Officers' motion invoked Rules 50 and 59 as authority for their motion to alter or amend judgment.  See Motion to Alter or Amend Judgment, p. 1.  The standard of review with respect to a decision on a renewed Rule 50 motion for

judgment is *de novo*.  *See*, *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th Cir. 1999).  The standard of review of a district court decision on a motion to alter or amend judgment under Rule 59 is one of abuse of discretion.  *Pac. Ins.Co. v. Am. Nat'l Ins. Co.*, 148 F.3d 396, 402 (4th Cir. 1998); *EEOC v. Lockheed Martin Corp. v. Aero & Naval Sys.*, 116 F.3d 110, 112 (4th Cir. 1997).

**B.**    **The District Court Did Not Err In Denying The Officers Motion To Alter Or Amend The Judgment.  Regardless of the Jury's Verdict On The Excessive Force Claim,  The Jury Had Considerable Evidence Upon Which To Base Its Verdict That The Officers Violated Cornish's Constitutional Rights By Failing Properly To Knock and Announce And To Find That The Violation Was A Proximate Cause Of Cornish's Death.**

Fed .R. Civ. P. 59(e) allows a court to alter or amend judgment.  The rule does not specify the grounds for such a motion, but case law does.  A judgment may be amended in only three circumstances: "(1) to accommodate an intervening change in the law; (2) to account for new evidence not available for trial; (3) to correct clear error or prevent manifest injustice."  *Pac. Ins.Co. V. Am. Nat'l Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).  The Officers did not articulate in their motion to alter or amend the judgment any of the recognized grounds for granting such a  motion.  Like any motion under the federal rules, the motion to alter or amend under Rule 59(e) must "state with particularity the grounds for seeking the order."  Fed. R. Civ. P. 7(b)(1)(B).  *See*, Federal Rules of Civil Procedure 59,

-27-

Advisory Committee Notes (1996 Amendments)(In considering whether a given

ground has or has not been advanced in the motion made by the party, it should be

borne in mind that the particularity called for in stating the grounds for a new trial

motion is the same as that required for all motions under Rule 7(b)(1).")  Because

the Officers' motion to alter or amend the judgment failed to state with

particularity any of the recognized  grounds for amending a judgment under Rule

59(e), and because on appeal the Officers have not asserted such particular

grounds for reversal, there is no showing that the district court abused his

discretion in denying the motion under Rule 59(e).

Assuming that the Officers' motion to alter or amend the judgment was a

renewed motion for judgment as a matter of law under Rule 50(b), the grounds for

granting such a motion are set forth in paragraph (a)(1) of the Rule as follows:

> If a party has been fully heard on an issue during trial and the court
> finds that a reasonable jury would not have a legally sufficient
> evidentiary basis to find for the party on that issue, the court may (A)
> resolve the issue against the party; or (B) grant a motion for judgment
> as a matter of law against the part on a claim or defense that, under
> the controlling law, can be maintained or defeated only with a
> favorable finding on that issue.

A court may not enter a judgment as a matter of law under Rule 50 unless "a

reasonable jury could reach only one conclusion based on the evidence or if the

verdict in favor of the non-moving party would necessarily be upon speculation

-28-

and conjecture, judgment as a matter of law must be entered." *Myrick v. Prime Ins. Synd., Inc.*, 395 F.3d 485, 489-90(4th Cir. 2005)  If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied.  *Hofherr v. Dart Indus., Inc.*, 853 F.2d 259, 261-62 (4th Cir. 1988).  Finally, "the evidence and all reasonable inferences from it are assessed in the light most favorable to the non-moving party, and the credibility of all evidence favoring the non-moving party is assumed."  *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 160 (4th Cir. 1988)(*internal citations omitted*).

The gist of the Officers' argument that Kane is limited as a matter of law to nominal damages on the knock and announce claim is set forth in their brief at p. 34:

> The jury determined that Brian Lewis' use of force was reasonable. JA 1091. Thus, the jury necessarily concluded that Cornish *realized and appreciated* that the Officers were police officers prior to advancing upon Brian Lewis with a knife and necessarily found that Brian Lewis shot Cornish in self defense. There simply was no evidence that would have allowed the jury reasonably to conclude otherwise and still find that Brian Lewis' use of force was non-tortious.  (*Emphasis supplied.*)

The argument is invalid for several reasons.  The jury was never asked to make special written findings with respect to factual issues.  Fed. R. Civ. P.

49(a)("The Court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact.").  The jury was not asked whether Cornish "realized and appreciated the Officers were police officers."  Nor was the jury asked whether Cornish advanced upon the officers carrying a knife.  It was asked whether it found by a preponderance of evidence that "Officer Brian Lewis violated Andrew Cornish's federal constitutional rights by using unnecessary and excessive force in shooting him?"  JA 1091.  No matter how much the Officers may want it to be, the jury's verdict cannot be morphed into special written findings of fact indicating that Cornish knew it was the police who broke doors to his apartment at 4:30 a.m. or that he advanced on the Officers carrying a knife.  Nor can it be argued that by its verdict on the excessive force claim the jury drew the particular factual conclusions which the Officers contend.  To the contrary, there was considerable evidence upon which the jury could draw the opposite conclusions.

## I.

On the basis of the evidence, the jury could find that Cornish did not know that police officers had broken open his apartment door because the Officers had failed to knock and announce their presence and purpose before entering the apartment.  The jury had evidence that Cornish acted like any person who was

awakened in the middle of the night by an unannounced breaking of his front door. The jury could find that in response to the  unannounced entry, Cornish jumped out of bed in his night clothes and rushed to the door; that in the process, he may or may not have grabbed a knife – one of many in his bedroom– and if he did grab one, he acted reasonably in doing so because he was acting in the defense of his own life; that Cornish went through the living room and approached the kitchen, and that Brian Lewis, who was in the kitchen, immediately shot him.  On the basis of these findings, the jury could well decide that it was the Officers' failure to knock and announce which caused Lewis to see Cornish as an immediate threat to his life.  Under this view of the evidence, a jury might not conclude that Brian Lewis used excessive force.  But, at the same time, the jury could well conclude that the Officers violated Cornish's constitutional rights by failing to knock and announce and that the Officers' actions were a proximate cause of Cornish's death.

The Supreme Court has consistently recognized that the knock-and-announce requirement serves to protect "life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Hudson v. Michigan*, 547 U. S. 586, 594 (2006); *Miller v. United States*, 357 U.S. 301, 313 n. 12(1958)("Compliance [with the requirement of prior notice of authority and purpose before forcing entry into a home] is also a safeguard for the

police themselves who might be mistaken for prowlers and be shot down by a

fearful householder."). In *McDonald v. United States*, 335 U.S. 451, 460-461

(1948), Justice Robert Jackson warned:

> Many homeowners in this crime-beset city doubtless are armed.
> When a woman sees a strange man, in plain clothes, prying up her
> bedroom window and climbing in, her natural impulse would be to
> shoot. A plea of justifiable homicide might result awkwardly for
> enforcement officers. But an officer seeing a gun being drawn might
> shoot first. Under the circumstances of this case, I should not want
> the task of convincing a jury that it was not murder. I have no
> reluctance in condemning as unconstitutional a method of law
> enforcement so reckless and so fraught with danger and discredit to
> law enforcement agencies themselves.

These words ring true, particularly in view of the facts of the present case. A

failure by the police to knock and announce a police presence at 4:30 a.m. coupled

with a violent and forcible entry into a home is surely a method of law

enforcement fraught with danger. Any citizen confronted by unknown intruders in

the dead of night may grab a weapon and rush to the door. Thus, the requirement

of proper notice and fair warning before entering the home serves an important

purpose. As the Supreme Court recognized in *Miller v. United States*, *supra*,

"[t]he requirement of prior notice of authority and purpose before forcing entry

into a home is deeply rooted in our heritage and should not be given grudging

application."

-32-

Because it was foreseeable that "an unannounced entry may provoke violence in supposed self-defense by the surprised resident," the jury had ample evidence to find that the officers' refusal to knock and announce was the proximate cause of Cornish's death.  Section 1983 "should be read against the background of tort liability which makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961).  Section 1983 provides that "[e]very person who, under color of any statute, ordinance, [etc.] subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ... ."  The Court instructed the jury that "[a]n act is a proximate cause of injury if it was a substantial factor in bringing about that injury, and if the injury was a reasonably foreseeable consequence of the act."  The Officers do not challenge the instruction.  The jury had sufficient evidence to conclude that in the absence of a knock and announcement of the officers' presence and purpose, it was reasonably foreseeable that a surprised Cornish may rush to the front door and take action in supposed self-defense and that a police officer may view that action as threatening and shoot and kill him.  In short, the jury had sufficient evidence to find that the Officers' failure to properly knock and announce was a proximate cause of Cornish's death.

-33-

That the failure by police officers to properly knock and announce before entering a home to execute a search warrant could result in injury was a known fact in the Fourth Circuit's history of cases. In *Gould v. Davis*, 165 F.3d 265 (4th Cir. 1998), a homeowner, Gould, alleged that officers executing a warrant entered his home by striking his front door with a battering ram at between 5:00 a.m. and 6:00 a.m. and did so without first knocking and announcing their presence and purpose. Fearing that intruders had entered his home, Gould went to his bedroom closet and retrieved a handgun for his protection. Officer Davis was the first person to enter the bedroom and saw Gould with a gun in his hand. Davis shot Gould, injuring him. At issue was whether there were any facts which excused the officers from dispensing with the knock and announce requirement. The Court held that the district court properly denied summary judgment on the grounds that there were no exigent circumstances which excused the officers from knocking and announcing. While the holding in the case is not relevant here, it illustrates how officers' failure to knock and announce in the course of executing a search warrant can result in serious injury. *See*, *Noel v. Artson*, 641 F.3d 580 (4th Cir. 2011)(5:00 a.m. SWAT entry into home to execute search warrant in case where officers were excused from knocking and announcing resulted in an officer

-34-

shooting and killing woman who thought intruders had entered the house and armed herself).

## II.

Under the Officers' version of the evidence Cornish had enough time to comprehend that the men who broke doors to his apartment were police officers and therefore stay his hand. However, on the basis of the evidence the jury was free to reject that version.

First and foremost, the jury had sufficient evidence to find that the Officers failed to  knock and announce at Cornish's apartment door.  Nathan Latting and Karen Camper testified that they did not hear any knock and announcement at the outside exterior door to the house. In addition, there was an absence of repairable damage to that door, indicating that the door was either unlocked or that the police forced it open without much effort or noise.  Given this, the jury could infer that Latting and Camper were capable of hearing any knock and announcement at Cornish's apartment door if it were given.  A loud knock and announcement inside the house at Cornish's apartment door would likely be audible to the downstairs neighbors.  This would particularly be true if the police did not knock on Camper's apartment door, as both Latting and Camper confirmed.  It follows that the jury could find on the basis of Latting and Camper's testimony alone that the

Officers in fact did not knock on Cornish's apartment door.  Alternatively, a jury

could reasonably infer that the Officers did not knock on Cornish's apartment door

because of the simple fact that the police team didn't knock on Camper's

apartment as well.  The Officers' stated intention was to maintain the element of

surprise and make a "dynamic entry."  This is in keeping with an unlawful purpose

not to disclose their presence and is at odds with an intention to comply with a

knock-and-announce requirement.  The jury could well find that officers so

motivated would not knock and announce and that the Officers in this particular

case didn't knock and announce at 408 High Street for that very reason.[1]

    Next, the jury had a substantial amount of evidence to cast doubt on the

Officers' version as to what happened upstairs.

_____

    [1]  In this vein, the commander of ERT, testified that as long as he has been a
member of the police department, "[w]e have never done a no-knock warrant.
Never."  JA 875.  Officer Lowe said the same thing, and he has done between 50
to 100.  JA 824. It prompts one to wonder whether these officers are actually
complying with the knock-and-announce requirement.  There are exceptions to the
knock and announce requirement, including whether knocking would endanger the
officers or prompt the destruction of evidence.  *See*, *Gould v. Davis*, 165 F.3d 265,
270 (4th Cir. 1998).  It strains credulity to believe that in their experience in
executing search warrants they have not found any case in which the exceptions to
the knock and announce requirement came into play.  This may be from a lack of
adequate training.  Asked whether the Fourth Amendment required a knock and
announcement by the police before entering a residence to execute a search
warrant, Lowe said, "I'm not really up on that."  JA 843.

(1)  Brian Lewis and Jensen Shorter testified that Cornish's bedroom door flew open and knocked him hard and to the right and almost down to the floor. But the area in which Shorter said he was hit and knocked to had a bicycle standing up and leaning against its kick stand and an upright stereo speaker, not to mention other objects which appear to be in their normal position and undisturbed. A jury could find this to be a physical impossibility if Shorter and Brian Lewis' testimony about the bedroom door flying open were true.

(2) There was no explanation worthy of belief why Jensen Shorter, the "point man," was not the one to defend against Cornish's alleged attack on the officers.  As the point man, Shorter was trained to handle the threats, he was better equipped and better armed, and he was bigger than Brian Lewis.  It would not make sense that Brian Lewis, rather then Shorter, was the one who shot Cornish when he allegedly burst out of his bedroom and charged after Lewis.

(3) Shorter and Lewis' testimony was premised on the fact that the door to Andrew Cornish's bedroom was supposed to be closed when they entered the living room and that Shorter kicked it several times in an effort to get it to open. Brad Cornish testified that when he left a few hours before the incident Andrew's bedroom door was left open.  Brad also testified that there were no boot marks on the bedroom door.  One could also question whether a trained S.W.A.T officer,

-37-

such as Shorter, would kick a door against its hinges, or not take precautions against a door flying open by toeing the door with a suitable doorstop. Finally, Brad Cornish testified that the bedroom door was ill-fitting and that it had to be physically lifted in order to open or close it. This is inconsistent with the door flying open and striking Shorter.

The Officers argue that the knock and announce violation was merely a "but-for" cause of Cornish's death, not a proximate cause. They argue that they are not liable for harm produced by a superseding cause and that Cornish's conduct was a superseding cause of his own death. These arguments must fail. A superseding cause is one that is "not within the scope of the risk created by the actor's conduct." RESTATEMENT (SECOND) OF TORTS § 442b (1965). Because "an unannounced entry may provoke violence in supposed self-defense by the surprised resident," Cornish's response to an unannounced entry is within the scope of the risk caused by the Officers' failure to properly knock and announce at the door – a completely foreseeable consequence of the failure to knock and announce. Thus, Cornish's conduct is not a superseding cause of his death.

If the Officers are right, Cornish consciously attacked them, fully aware that they were police officers. If jurors believed that, then they would not have found

-38-

that the Officers' violation of the knock-and-announce requirement was a proximate cause of Cornish's death, presuming as we must that the jurors faithfully applied the proximate cause instruction, for in such case the Officers' failure to knock and announce would not be a controlling factor in bringing about Cornish's death.

### C.    The Cases Relied Upon By The Officers Are Inapposite.

*Bodine v. Warwick*, 72 F.3d 393 (3rd Cir. 1995), cited by the Officers, does not support their position. There the Third Circuit rejected a bright line rule that any use of force by a police officer after an illegal entry is *per se* excessive and unreasonable and a violation of the Fourth Amendment. The court explained, *id.*, 400-01:

> If at a retrial of this case the jury decides that the troopers' entry was unlawful, it will be necessary to determine how much of the injury suffered by Bodine was "proximately" or "legally" caused by the illegal entry, and we express no view on this question at this time. Thus, if the troopers are found to have entered the Bodine residence illegally, they should be held liable for the harm proximately caused by the illegal entry. Similarly, if the troopers are found to have used unlawful force, they should be held liable for the harm proximately caused by this use of force. The harm proximately caused by these two torts may overlap, but the two claims should not be conflated.

-39-

The court emphasized that it expressed "no view" on the question whether and to what extent the injury in that case was proximately caused by the illegal entry.  It noted, *id.*, 398:

> Because Bodine had seen the troopers and *knew* that they were outside, some of the dangers often associated with unannounced, forcible entries – for example, the danger that the troopers would be mistaken for burglars – were diminished. *(Emphasis added.)*

Bodine did not allege that the police roughed him up because he resisted what he thought was an illegal entry by an unknown intruder.  The following hypothetical set forth in the *Bodine* opinion underscores this distinction.

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking or announcing their presence. Once inside, they encounter the suspect, *identify* themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when the officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is no.  *See*, The suspect's conduct would constitute a "superseding cause," that would limit the officer's liability. (*Emphasis added.*)(*Internal authorities omitted.*)

*Id.*, 400.  According to the hypothetical, the fact that the officers "identify" themselves and "show the warrant" dispels alarm and eliminates the danger associated with an unannounced entry.  But once the suspect breaks away and

shoots two officers there is little debate that the suspect's actions are a superseding

case of his injuries because his actions are not a foreseeable consequence of the

unannounced entry.

Estate of Sowards v. City of Trenton, 125 Fed. Appx. 31 (6th Cir. 2005),

another case cited by the officers, is equaling unpersuasive. In that case, a

mentally disabled man who had pulled a knife on another person fled into an

apartment and barricaded himself inside. He refused to open the door and

threatened to give the police a "surprise" if they entered the apartment. The

officers kicked open the door and the man then pointed a gun at the officers

through the door opening. Several officers fired their guns, killing the man.

Assuming that the officers illegally entered the apartment, the court held that the

decedent's actions in pointing a gun at the officers was a superseding cause of his

death and relieved them of liability. The case is distinguishable because the

subject inside of the apartment was not surprised by the entry and knew he was

dealing with the police. Thus, the dangers posed by an unannounced illegal entry

did not exist.

Finally, the facts of James v. Chavez, 511 Fed. Appx. 742 (10th Cir.

2013)(unreported) are inapposite. A mentally unstable or drunk man (Murphy)

barricaded himself in his home and refused police officers orders to allow his

-41-

daughter to leave. A SWAT team entered the house because the young lady's life was in danger. The man inside assaulted a SWAT officer who shot and killed Murphy. The Tenth Circuit affirmed summary judgment against the Murphy estate because undisputed facts proved that the man's conduct was as superseding cause of his own death. The court noted the following details: "Mr. Murphy was not a homeowner defending his home against unknown intruders. Rather, it is apparent from the numerous interactions between Mr. Murphy and the people outside his home that he knew they were police officers." The court noted that under New Mexico law Murphy was not at liberty to attack someone he knew was a police officer. The case is a far cry from the instant case where the jury could find on the basis of the evidence that Cornish had little to no opportunity to know that it was the police who entered his house because of the failure of the police to make their presence known by properly knocking and announcing at Cornish's door.

## II. THE DISTRICT COURT DID NOT ERR WHEN IT DENIED THE OFFICERS'S MOTION TO ALTER OR AMEND THE JUDGMENT ON THE BASIS OF THE QUALIFIED IMMUNITY DEFENSE.

### A. Standard of Review

The standard of review with respect to the denial of a Rule 50 motion for judgment after verdict is *de novo*. *See*, *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th Cir. 1999).

-42-

**B.    The Officers Cannot Make A Qualified Immunity Defense On The Basis Of A Particular Set Of Facts Because They Failed To Request Specific Factual Findings Which Would Identify The Particular Conduct Which They Contend They Did Not Know Was Unlawful.**

The Officers contend that the district court erred by not granting their motion to alter or amend the judgment with respect to the qualified immunity defense. They argue:

> As demonstrated by Jury Note 3 (JA 331) and the verdict sheet (JA 1091), the jury found that the Officers knocked and announced their presence at Andrew Cornish's door, but is also determined that the Officers did not "properly" wait long enough before entering. JA 1091. Here, the right in question is not the general right to be free from officers entering your home after knocking and announcing (at the front exterior door and/or apartment door) but without waiting a sufficient amount of time before entering under the particular circumstances.

Brief, pp. 44-45.

The response to this argument may be brief. The jury note does not remotely mean what the Officers contend. The note stated: "Does the knock and announce legally start at the exterior door or at the apartment door based on the fact the warrants are for two separate apartments?" JA 331. The note is not a finding by the jury or a formal determination of an issue of any kind. It is a *question*, and no more than that. Nor can the jury note in conjunction with the jury's verdict be interpreted to mean that the jury determined that the Officers'

-43-

violated the Cornish constitutional rights by not waiting a sufficient amount of time before entering the apartment. The verdict sheet stated "that the individual defendants violated Andrew Cornish's federal constitutional rights by failing properly to knock and announce before entering the apartment." JA 1091. The jury was just not asked to answer factual questions concerning how the officers failed properly to knock and announce before entering the apartment.

For these reasons, the record does not support a contention that the Officers have qualified immunity based on not waiting a sufficient amount of time before forcibly entering Cornish's apartment and eliminates the defense of qualified immunity on the basis of such conduct. The Officers have failed to squarely present the defense and failed to preserve the issue for review.

In *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005), the Court held that "the legal question of a defendant's entitlement to a qualified immunity under a particular set of facts should be decided by the court, not by the jury." The court further explained., *id.*:

> [T]o the extent that a dispute of material fact precludes a conclusive ruling on qualified immunity as the summary stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury.

-44-

Qualified immunity is an affirmative defense and "the burden of pleading it rests with the defendant." *Gomez v. Toledo*, 446 U.S. 635, 639-641 (1980). *See*, *Crawford-El v. Britton*, 523 U.S. 574, 587 (1997). The defense must be properly and timely presented. *Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000)("a claim of qualified immunity can be waived if not squarely presented to the district court"); *Suarez Corp. Industries v. McGraw*, 125 F.3d 222 (4th Cir. 1997)(qualified immunity cannot be asserted for the first time on appeal).

Since the Officers did not request the district court to ask the jury to answer factual questions to identify the conduct upon which the jury concluded that the Officers failed properly to knock and announce before entering Cornish's apartment, they have failed to squarely present the qualified immunity defense to the district court and failed to preserve the issue for appellate review.

It was not Kane's obligation to ask the district court to frame suitable factual questions relevant to the qualified immunity defense. In *Gomez v. Toledo*, *supra*, 641, the Court stated: "As our decisions make clear, whether [qualified] immunity has been established depends on the facts peculiarly within the knowledge and control of the defendant." The Court held: "We see no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith." *Id.* The plaintiff has no

-45-

obligation to divine what facts were peculiarly within the Officers' knowledge and control and determine which facts would serve as the basis for the qualified immunity defense. It was solely the duty of the Officers to identify the particular set of facts upon which to base the defense of qualified immunity and it was their duty to frame the questions to be given to the jury to answer.

> **C. Viewing The Evidence In Kane's Favor, The Jury Decided That The Officers Failed To Knock And Announce Before Entering Cornish's Apartment. This Was A Violation Of Clearly Established Law And Ends The Issue. If One Also Considers That The Officers Failed Properly To Knock And Announce By Not Waiting A Sufficient Amount of Time Before Entering The Apartment, This, Too, Was A Violation Of Clearly Established Law.**

In deciding whether a renewed motion for judgment was properly decided, "the evidence and all reasonable inferences from it are assessed in the light most favorable to the non-moving party, and the credibility of all evidence favoring the non-moving party is assumed." *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 160 (4th Cir. 1988). Viewing the evidence in the light most favorable to Kane, the jury had ample evidence upon which to find that the Officers violated Cornish's constitutional rights by not knocking and announcing their presence and purpose at Cornish's front door before entering the apartment. It is clear that the Officers do not have qualified immunity for such conduct. As this Court noted in *Gould v.*

*Davis*, 165 F.3d 265, 270 (4th Cir. 1998), "the knock and announce requirement has been clearly established law in the Fourth Circuit since at least 1985."(*Citing Mensh v. Dyer*, 956 F.2d 36, 40 (4th Cir. 1991); *Simons v. Montgomery County Police Officers*, 762 F.2d 30, 32 n. 1 (4th Cir. 1985).

Assuming the jury found that the Officers violated Cornish's constitutional rights by not waiting a sufficient time before entering Cornish's apartment, the Officers still are not entitled to qualified immunity.

Qualified immunity is available when the conduct of a government employee "does not violate clearly established statutory and constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1981)*; Gould v. Davis*, 165 F.3d 265, 269 (4th Cir. 1988). Two questions arise: was the right clearly established at that time, and would a reasonable person in the officer's position have known that his actions violated that right.

In *United States v. Banks*, 540 U.S. 31, 35 (2003), the issue was whether the police had waited long enough before forcibly entering a house to execute a search warrant to search for illegal drugs in a felony case. In that case, the question was whether an interval of 15 to 20 seconds after the officers knocked and announced until they forced entry was reasonable, given the exigency of possible destruction

-47-

of drugs.  But, the Court stated: "Absent exigency, the police must knock and receive an actual refusal or wait out the time to infer one." *Id.*, 43.  This was part of the law in the Fourth Circuit as well.  *See*, *United States v. Young*, 609 F.3d 348, 353 (4th Cir. 2010)("A constructive refusal occurs, giving the police the right to enter by force, where the occupants do not admit the officers within a reasonable period of time); *United States v. Lipford*, 203 F.3d 259, 270 (4th Cir. 2000); *United Stated v. Ward*, 171 F.3d 199, 193-94 (4th Cir. 1999).  "The reasonableness of the delay varies in each case and depends on the totality of the circumstances." *Young*, *id*.

The Officers argue that the amount of time to wait after announcement is not precisely defined in the case law and they were unaware that their conduct was unlawful.  The fact that the law does not impose a set amount of time to wait does not make the law doubtful or not clearly established.  In order to find that the law in a particular area is clearly established, "there need not be a case directly on all fours." *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995)(*en banc*).  *See also*, *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct  2508,  2516 (2002)("officials can still be on notice that their conduct violates established law even in novel circumstances").  Officer John Lewis testified that there two sets of knocks with announcements and a wait of one to three seconds before the officers broke down

-48-

Cornish's apartment door. Under the case law that existed at the time of this case, any reasonably well trained police officer would know that at 4:30 a.m. one to three seconds is inadequate to give anyone in Cornish's position time to wake up, pull on clothes and get to the door to open it.

Several cases have assessed the length of time between an announcement and forcible entry. *See*, *e.g., United States v. Banks*, *supra,* 527 (15 to 20 seconds was long enough for exigency of destruction of evidence to ripen in a felony drug case); *United States v. Young*, *supra, 353* (agents after twenty seconds could properly infer that they were refused admittance to townhouse where agents saw resident come to the door); *United States v. Lipford*, *supra* (after undercover posing as drug-buyer knocked on door of house and resident answered the door and told person to go away, wait of five seconds without a response deemed reasonable amount of time before forced entry); *United Stated v. Ward*, *supra* at 193-94 (sixty second period of wait deemed reasonable). Even "if there is no bright-line rules establishing the length of time that police must wait to enter after announcing their presence," *United States v. Young*, *supra,* 353, if the "contours or the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), then qualified immunity does not apply. In May 2005 it was clear that

either a failure to knock and announce or a refusal to wait more than a few seconds for refusal to be admitted inside the apartment was unreasonable. The Officers at best had probable cause to believe that Cornish possessed marijuana, and probably no more than for his personal use. The Officers lacked any evidence to excuse them from dispensing altogether with the knock and announce requirement or shortening the time for Cornish to make it to the door. There was no evidence whatever that Cornish was engaged in destruction of evidence because the Officers did not hear any footsteps heading to the kitchen sink or bathroom. And there was no danger that the officers' lives were in danger by waiting a reasonable length of time for Cornish to get to the door. The Supreme Court held three years before the events in this case, that "[a]bsent exigency, the police must knock and receive an actual refusal or wait out the time necessary to infer one." *United States v. Banks*, *supra*, 43. The Officers had fair warning that the extremely short time they in fact waited before forcibly entering Cornish's apartment was clearly too short and highly unreasonable under the existing law. Thus, the Officers are not entitled to qualified immunity for such conduct.

## III.   THE COURT'S INSTRUCTIONS ON KNOCK AND ANNOUNCE WERE LEGALLY CORRECT.

### A.   Standard of Review

A district court's refusal to provide an instruction requested by a defendant constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired his defense." *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995).  The party challenging the jury instructions faces a heavy burden, for "we accord the district court much discretion" to fashion the charge.  *Teague v. Bakker*, 35 F.3d 978, 985 (4th Cir. 1994).

The Officers's Statement of Issues, No. IV, frames the jury instruction issue this way:

> Whether the district court erred by refusing Appellants' requested jury instruction that the knock and announce at the front door of the house, if the jury found that one occurred, should be considered in assessing the overall reasonableness of the actions and "wait time" of the Officers before entering the apartment of Andrew Cornish?

In their Brief, the Officers point to their proposed jury instructions No. 29A was the specific instruction which they wanted and which the district court refused to give.  Officers' Brief, p. 52.  The Officers' counsel summarized the point of the

instruction, stating "that if there's a proper knock and announce outside, that suffices." JA 911.

> Instruction 29A stated in pertinent part as follows:
>
> [I]f you find the Officers announced their presence at either the common door to the apartment building or the door to Andrew and Brad Cornish's apartment, and waited a reasonable amount of time before forcibly entering, you are instructed that the Officers complied with the federal knock and announce rule. JA 337.

The district court declined to give the instruction. The court's instructed the jury that the police announcement "must be given in a time and in a manner to satisfy the purpose served by ["the knock and announce rule"] requirement. Warnings which are given after the fact or at a time that does not adequately communicate the officers' identity and purpose are legally ineffective." JA 965.

Subsequently, during jury deliberations, the jury submitted a question which asked whether "the knock and announce legally start at the exterior door or at the apartment door based on the fact the warrants are for two separate apartments?" JA 331. The district court answered the question by stating that "the knock and announce requirement clearly existed at the apartment door. You couldn't go into that apartment without knocking at that door." JA 1062. At that time, the district could stated that Instruction 29A was legally incorrect because it allowed the jury

to conclude that the Officers complied with the knock-and-announce rule if they knocked on the outside door to the apartment building only.  JA 1053.

The district court was legally correct because a knock and announcement at the outside door to the apartment building was not at Cornish's dwelling itself and thus was not what the law required.  The evidence was that the outside door was kept unlocked and that the door had a large see-through glass insert.  It was kept unlocked for convenience because the residents lacked a key, according to Latting. The landlord regularly entered the building without a key in order to collect the rent.  Significantly, the Officers did not plan to knock and announce at that door in the first place, because they fully expected the door to be unlocked.  The downstairs occupants could enter the exterior door to get to their residence without seeking permission of the downstairs residents and vice-versa.  It opened to a common area that led to individual dwelling units. Under these circumstances, a knock and announcement at the outside door to the apartment building would have been legally meaningless and did not promote the purpose of the knock-and-announce rule to protect privacy, reduce violence, or prevent destruction of property.

The cases recognize that the knock and announce requirement applies to the particular dwelling, not to each door of the dwelling.  *United States v. Bragg*, 138

F.3d 1194 (7th Cir. 1998); *United States v. Crawford*, 657 F.2d 1041 (9th Cir. 1981).  In those cases, a knock and announcement at an outside door was sufficient because there was only one dwelling at issue.  Those courts held that it was not necessary to knock at each inner door in the dwelling because notice at the front door was calculated to safeguard the purpose of the knock-and-announce rule.  In the instant case, however, a knock and announcement was inadequate to safeguard the purpose of the rule.  There were two separate dwellings at 408 High Street, not one.  Two separate search warrants were to be executed, a warrant for each dwelling.  Cornish was entitled individually to adequate notice of the officers' identity and purpose and an opportunity to respond to the door to open it.  Fair warning to Cornish could not be assured if the knock and announcement took place at the outside door.  One may ask as well, how was Cornish to know he was required to open *his* door based upon a knock and announcement at the outer door?  He may well think that the police were there to search the downstairs apartment, not his.  The Officers were on notice that there were two separate dwellings involved and that's why they say that they intended to knock and announce on Cornish's apartment door, regardless of whether they knocked and announced on the outside door to the building.

In a different case, if police officers intend to execute a search warrant in an apartment building with multiple units, one would naturally expect that officers would knock and announce at the particular dwelling to be searched, not at the outside door to the building. The same reasoning applies here.

By contrast, if there was only one dwelling in the house, or if there was an expectation of privacy in the vestibule or an entrance way behind the outside door, an argument could be made that a knock and announcement was required at the outer door. In that event, no knock and announcement would be required at each inner door. *See*, *United States v. Drummond*, 98 F. Supp. 2d 44, 50 (D.C. 2000)(knock and announcement required at exterior door because defendants had expectation of privacy in area behind that door; no one – not mail carriers, meter readers, other tenants ... no one – had access to the area). This was not the case at 408 High Street. There was no general expectation of privacy in the vestibule or area behind the outside door, for the reasons mentioned.

This Court will not set aside a jury verdict based on instructional error "unless the erroneous instruction seriously prejudiced the challenging the challenging party's case." *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005). The Officers contend that they were seriously prejudiced by the instruction because whether the Officers actually knocked and announced at the

-55-

outside door to the apartment building was "relevant to the overall circumstances"
and the district court discounted the importance of the issue by telling the jury
whether the police knocked on the outside door was legally immaterial.

The Officers' argument misses the mark. After instructing the jury that "the
knock and announce requirement clearly existed at the apartment door," the
district court went on to say to the jury:

> We really think its legally immaterial whether the requirement began
> at the exterior door. That said, we recognize that it may be important
> for your deliberations because it may bear upon, because there was a
> conflict in the evidence, the testimony, as to whether or not there an
> announcement at the outside door. The police officers testified that
> they did. There was evidence from Ms. Camper and Mr. Latting that
> they might not have. Se we recognize it may be material to your
> judging of the credibility of the witnesses, and that's really your
> function.

JA 1062. This instruction clearly informed the jury that whether the police
knocked on the outside door was an issue relevant to judging credibility and to
determine the facts as to what happened, but that it was not legally material as to
the question posed by the jury, namely, when the duty to knock and announce
legally commenced. The Court's instruction was legally correct and did not
prejudice the Officers.

**IV.  THERE IS NO IMMUNITY FOR A MARYLAND CONSTITUTIONAL VIOLATION.**

**A.    Standard of Review**

The standard of review with respect to the denial of a Rule 50 motion for judgment after verdict is *de novo.  See, Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th Cir. 1999).

The Officers conceded that Maryland law affords no common law immunity in damages for a state constitutional tort committed by municipal officers. Notwithstanding, they contend that under Maryland Code, Courts Art., 5-507 (a), they have complete immunity for a state constitutional violation unless there is evidence that the Officers acted with actual malice.  They cite to no case which has held that the statute confers immunity for a constitutional violation.

In a long line of cases, Maryland has consistently upheld actions to redress violations of the Maryland Constitution.  *See, e.g., Clea v. City of Baltimore*, 312 Md. 662 (1988)("This Court has consistently held that a public official who violates the plaintiff's rights under the Maryland Constitution is personally liable for compensatory damages."); *Widgeon v. Eastern Shore Hosp. Center*, 300 Md. 520, 537-538 (1984)(when an individual suffers a violation of rights protected under Article 24, "he may enforce those rights by bringing a common law action

-57-

for damages"); *Ashton v. Brown*, 339 Md. 70, 103 (1995)("the immunity of the State could not shield public officials from liability for their actions in violation of the state constitution"); *DiPino v. Davis*, 354 Md. 18, 50-51 (1999)("we have characterized civil violations of State constitutional protections as 'constitutional torts'" and "redress for State violations is through a common law action for damages"); *Richardson v. McGriff*, 361 Md. 437, 445 (2000)(acknowledging a Fourth Amendment type excessive force claim under Art. 26 of the Maryland Declaration of Rights). In each of these cases, the court makes clear that Maryland law does not grant immunity to a public official, of any stripe, for a Maryland constitutional violation. It would be strange indeed if Maryland law would carve out an exception for municipal police officers to the broad principle that public officials do not enjoy immunity for a Maryland Constitutional violation.

## <u>CONCLUSION</u>

Based upon the foregoing, this Court should affirm the judgment below.

<u>/s/ Terrell N. Roberts, III</u>
Terrell N. Roberts, III
Attorney for Appellant
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
301 699 0764

*Counsel for Appellee*

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because:

this brief contains <u>13,940</u> words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportional spaced typeface using
<u>Word Perfect</u> in <u>14 point Times New Roman</u>.

/s/  Terrell N. Roberts, III
Terrell N. Roberts, III

*Counsel for Appellee*

Dated:  June 30, 2014

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 30, 2014, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF System, which will send notice of such

filing to the following registered CM/ECF users:

Daniel Karp
Victoria M. Shearer
KARPINSKI, COLARESI & KARP, PA
120 East Baltimore Street
Suite 1850
Baltimore, MD  21202

*Counsel for Appellants*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

/s/  Adrienne R. Acra-Passehl
Adrienne R. Acra-Passehl
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219